LOTTINGER, Judge.
The trial judge rendered written reasons for judgment which are as follows:
“These proceedings, consolidated for the purpose of trial, are actions in tort resulting from an automobile collision between a 19SS DeSoto owned and operated by Evest P. Pellegrin and a 1957 Chevrolet owned and operated by Aubrey J. Guidry.
“In Suit No. 18,138, Evest P. Pelle-grin and his insurer, St. Paul Mercury Insurance Company, sue Aubrey J. Guidry and his insurer, Canal Insurance Company. Plaintiffs allege that Pellegrin was driving his car northerly along (up) Louisiana Highway 57 paralleling Bayou Little Caillou, and that Guidry was driving his car in the opposite direction; that Pellegrin ‘came up to Victory Street’, a street perpendicular to, and running westerly from, State Highway 57, stopped and gave signals of his intention to turn left into Victory Street; and that, while stopped in his own proper lane, the defendant Guidry, approaching from the opposite direction, ‘crashed headlong into the Pellegrin automobile’. The plaintiffs aver that the collision and the damages occasioned thereby were the result of the negligence of Guidry, and they particularize several respective acts of negligence, including the charge that Guidry was driving while under the influence of intoxicating liquor.
“In Suit No. 18,137, Mrs. Angel Babin, wife of Evest P. Pellegrin, has sued Guidry and his insurer, Canal Insurance Company, and also St. Paul Mercury Insurance Company, her husband’s insurer, for damages for injuries suffered in the same collision. In addition to the allegations of negligence on the part of Guidry, the plaintiff also alleges ‘negligence or possible negligence of her husband’.
“In both proceedings, the defendants Guidry and Canal Insurance Company deny any negligence on the part of Gui-dry and aver the collision to have been the result of the negligence of Pellegrin in that he ‘negligently, and without warning or signal of any kind, and in total disregard of the rules of the road and the safety of others, suddenly veered or turned’ his car across the center of the highway and into Guidry's traffic lane, thus making it impossible for Guidry to avoid a collision; and they allege the negligence of Pellegrin to have been the proximate cause of the accident.
“In proceeding No. 18,137, the defendant St. Paul Mercury Insurance Company denies the alleged negligence of Pellegrin and avers the negligence of Guidry as the proximate cause of the collision.
“Five eye-witnesses to the collision testified: four of them in behalf of plaintiffs, and one for defendants.
“The testimony of Ronald Lirette is that he was standing between 50 and 75 feet away from the point of the accident when it occurred; that he saw both'cars before the accident; that he saw the Pellegrin car for a distance of about ‘half an acre’, that it was traveling at about 35 miles an hour before it came to a dead stop in its own right lane with its left signal light on, and that no part of the Pellegrin car was across the center line, and that there was one car ‘following in the back’; that when the Pellegrin car came to a stop, the Guidry car was ‘a good distance away’, ‘About an acres and a half’; that it was approaching at a ‘high rate of speed’, and went out of its lane twice before striking the Pellegrin car; and that after the impact the Pellegrin car was ‘just turned around’.
“Miss Beverly Bourg, who resides at the corner of the intersection, west of State Highway 57 and south of Victory Street, was standing near Victory Street talking to friends at the *565 time of the accident at a distance estimated at 100 feet from the place of the accident; that when she first 'glanced at the intersection’ she saw the Pelle-grin car stopped in its right lane 'waiting to make a turn’, where it ‘stayed stopped’ until the collision; that she first saw the Guidry car a substantial distance away and that it was ‘was traveling so fast I couldn’t tell whether it was a convertible or a hardtop’, its speed being estimated ‘at about 90 miles an hour’; that the Guidry car swerved into the traffic lane of the Pellegrin car; and that at the time of the accident the weather was clear and dry.
“Miss Brunella Bourg was sitting on the swing on the front porch of the Bourg home at the intersection of Victory Street and State Highway 57, facing Highway 57. She testified that the Pellegrin car was ‘definitely stopped’ in its ‘right lane with his blinking lights on’. She then saw the Gui-dry car at the moment of collision, but did not see in which lane of traffic Guidry was traveling at the time of impact.
“Mrs. Vallie Lapeyrouse testified that she lives on the north side of Victory Street, her house being the first house from the highway on that side of the street, but with a vacant lot lying between her property and State Highway 57. She estimated that her porch was about 250 feet from the intersection. She stated that she went on her porch at about six o’clock and that the accident happened about five or ten minutes later. That she saw the Pelle-grin car but not the Guidry car, and that the Pellegrin car was stopped for a substantial time before the impact, and remained stopped until it was struck. She could not state in which lane the Pellegrin car was stopped or whether there were any signals of any kind.
“The fifth eye-witness, Whitney Guy, was called in behalf of defendants. Mr. Guy testified that he was traveling along State Highway 57 following the Pellegrin car for a distance of about a mile. He stated that he knew that Pellegrin wanted to stop, that ‘he was slowing down, so I knew he wanted to stop’. He was certain that the Pellegrin car was stopped ‘on the right side’ with the left front wheel of the Pellegrin car on the black line. When asked: ‘Was any portion of Mr. Pellegrin’s automobile on the left side of the road?’, he answered, ‘No, it was just the wheel on the black line.’ He testified that he was about 25 feet behind the Pellegrin car when the collision occurred and that the Pellegrin car was stopped at the moment of impact.
“The testimony shows that Mr. Guy had previously given a written statement to the effect that the Pellegrin car was stopped entirely in its own lane, but at the time of the trial he insisted that the Pellegrin car was stopped with its left front wheel ‘against the black line’ at the time of the accident, and that such latter declaration should have been incorporated in the statement. The statement also contained Guy’s declaration that if Guidry had not struck Pellegrin, he would have struck Guy. It also appeared that Guy’s written statement had been given to, and translated by, a person of his own choice.
“We make the observation at this point that all of the foregoing witnesses impressed us as honest, sincere, unbiased and disinterested.
“The testimony of the eye-witnesses, including that of the defense witness Guy, is unmistakably clear, certain and categorical that the Pellegrin car had been brought to a complete stop in its proper lane and was in such stationary position at the moment of impact. It is not denied or contradicted by the defendant himself, except in the formal answer filed by his counsel. Indeed, the *566 defendant confirms the testimony of two witnesses as to his traveling at an excessive rate of speed by his admission that he was traveling 70 miles per hour and was testing a new automobile for pick-up speed.
“The only testimony that in any way varies or contradicts the testimony of the eye-witnesses is that of State Trooper Cowling, who arrived at the scene of the accident 30 minutes after he was notified, where he found the Pellegrin car ‘on the middle of the road crosswise of the road’, facing in an easterly direction towards the bayou. He stated that he ‘deducted’ by the skid marks left by the Pellegrin car ‘when it got knocked sideways’ that ‘the front end of his car was approximately three feet in the other man’s lane of traffic, and that ‘it was in the left hand lane approximately two feet, two or three feet across the middle line in Guidry’s lane of traffic’. He testified, however, that there was enough room in Guidry’s lane for him to have passed without hitting the Pellegrin car. He described the Pellegrin car as having been ‘knocked completely around toward the bayou, and that would make his front end be knocked about, oh, in a circular motion at least 25 feet’.
“It is apparent that, since the Pelle-grin car was brought to a stop by a gradual slowing down, no tire or skid marks were made by such action. It is equally evident that the skid marks mentioned by the investigating officer could only have been made after the impact. The testimony of the investigating officer as to the manner in which the Pellegrin car was ‘knocked completely around toward the bayou, and came to rest 'on the middle of the road cross-wise of the road’, indicates that the car described an arc of 270 degrees, or three-fourths of a circle. Since the car was facing in a northerly direction before the impact and in an easterly direction toward the báyou after-the impact, the 25 foot circular movement of the car in three-fourths of a circle must necessarily have been counter-clockwise. And since the Pellegrin car was in its right lane, the east lane, before the impact and came to a stop after the impact ‘on the middle of the road crosswise of the road’, we can draw no other inference from the testimony of the officer but that the entire course and movement of the car from the moment of impact to the moment of rest was entirely on the paved strip of highway. Although there is no testimony of the fact in the record, we take cognizance of the fact from our own knowledge that the wheel base of the Pellegrin 1955 DeSoto was 126 inches, or 10^ feet, only six inches less than the entire width of the traffic lane in which it was stopped before the impact. If the front end of the car (which must have been at least 16 feet long) moved a total distance of 25 feet in completing its movement of three-fourths of a circle entirely on the paved strip, and the car came to a rest in the middle of the road, then it seems to us to be reasonable to suppose, indeed, the conclusion appears to be inescapable, that some part of the movement of the car must necessarily have been across the center line of the highway and across the west traffic lane. We believe that that circumstance explains the finding of skid marks ‘two or three feet across the middle line’. In the light of the testimony of the eye-witnesses, including that of the defense witness, as to the position of the Pelle-grin car in its own traffic lane before the impact, we must conclude that the ‘deduction’ of the investigating officer was erroneous as to the Pellegrin car having been brought to a stop across the center line and as having projected into the west lane while at rest before the impact, and that the only reasonable inference to be drawn is that the skid marks were the result cf the Pellegrin car having been knocked into the opposite lane by the impact.
*567 “We note again the testimony of the defendant Guidry that he was ‘testing out a new automobile for pick-up speed’ and that he was admittedly driving 70 miles an hour. In addition, he testified that when he was about 15 or 20 feet away from the point of impact, he saw he couldn’t avoid the collision, and then turned loose the steering wheel and threw himself into the front seat of the car. These circumstances, the unequivocal testimony of the eye-witnesses as to the Pellegrin car being at rest in its own lane, and the testimony of the witness Lirette that the defendant went out of his lane twice before striking the Pellegrin car, demonstrate that the defendant Guidry was not keeping a careful lookout, was not driving in his own lane of traffic, did not have his car under control, and was generally driving in a reckless and careless manner.
“It is our opinion that the testimony establishes conclusively that the negligence of the defendant Guidry was the sole and proximate cause of the accident.
“There is substantial testimony in the record as to the inebriety of the defendant Guidry shortly before the collision, but, in the light of our conclusions hereinabove set forth, we find no need to consider that circumstance as a possible factor in the unfortunate occurrence.
“Mrs. Angel B. Pellegrin suffered injuries that confined her in the hospital for a week and at the home of her daughter-in-law five days. Thereafter she returned to her home, where her granddaughter performed all her household duties for two or three weeks, and assisted in their performance several weeks more. The testimony varies from one and one-half months to three months as to the time within which Mrs. Pellegrin’s disability prevented her doing her housework without assistance after she returned to her home.
“Dr. Givens reported finding severe contusions and hematoma formations on the left chest and upper left arm, injury to the right leg and knee, a fracture of one of the metatarsal bones of the right foot, a broken nose and black eyes, and a long severe cut across the right forehead that required twenty stitches to suture. The treatment of the injury to the forehead appears to have extended over a substantial period of time, a month or two of treatment, including three or four injections, being required to reduce swelling. According to Mr. Pellegrin, the ‘bump’ on his wife’s forehead was a source of concern and discomfort for a long time. Indeed, on the day of trial, the long scarred area of the forehead injury was plainly visible even at a distance, and constitutes a serious disfigurement. Mrs. Pellegrin still complains of frequent headaches, of which there was no history before the accident. The doctor’s testimony is that she was still suffering from headaches when he saw her in July, 1957, and that about two and a half months before the date of trial she was still making the same complaint, a circumstance that might be expected from severe head injuries.
“For the injuries described and the pain, suffering and anxiety incidental thereto, we fix damages in the sum of Six Thousand, five hundred dollars. It is noted that the policy limit of liability of the defendant insurer is Five thousand dollars.
“For the reasons assigned,
“It Is Ordered, Adjudged and Decreed that there be judgment in favor of the plaintiff, Mrs. Angel B. Pelle-grin, and (1) against the defendants Aubrey J. Guidry and Canal Insurance Company jointly and in solido in the sum of Five Thousand Dollars ($5,000.-00), with legal interest from judicial demand until paid, and (2) against the defendant Aubrey J. Guidry in the further sum of One Thousand five hundred dol *568 lars ($1,500.00), with legal interest thereon from Judicial demand until paid, and (3) against both of the said defendants for all costs.
“It is further ordered, adjudged and decreed that there be judgment against the plaintiff, Mrs. Angel B. Pellegrin, denying and dismissing her demands against the defendant St. Paul Mercury Insurance Company.”
The above judgment was modified by the trial court to reduce the amount for which defendant Aubrey J. Guidry was cast to the amount of $750.
The record amply justifies the factual conclusions of the trial Judge and we are of the opinion that the award was fair.
Consequently, the judgment appealed from is affirmed.
Judgment affirmed.